## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CAPITAL FINANCE, LLC,        *

     Plaintiff               *

v.                       *       Civil No. RDB-17-2107

OSCAR ROSENBERG, et al.,      *

     Defendant.           *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

On July 1, 2015 Plaintiff Capital Finance, LLC ("Capital Finance") and a group of eight skilled nursing facilities and long term acute care hospitals (collectively, the "Borrower"), controlled by Defendants Josef Neuman ("Neuman") and Oscar Rosenberg ("Rosenberg") (collectively, "Defendants"), entered into a Credit and Security Agreement (the "Credit Agreement") and a Revolving Loan Note. Pursuant to these contracts, Capital Finance agreed to furnish capital financing to these long-term care facilities, thereby insuring that they could maintain a source of working capital while experiencing significant delays between rendering healthcare services and receiving payments for these services. Neuman and Rosenberg personally guaranteed this financing.

As a condition precedent for obtaining additional loan advances under these contracts, Neuman, as the Manager of Borrower, submitted one-page Borrowing Base Certificates which warranted that the facilities were in accordance with the terms of the loan documents and had paid all state and federal payroll taxes. Additionally, the Credit Agreement required Borrower to deposit the proceeds from its collateral into bank accounts at Banco Popular protected by

a deposit account control agreement ("DACA"). Included among these proceeds were Medicare funds and intergovernmental transfer payments ("IGT" payments).

To secure loans from Capital Financing, Rosenberg and Neuman executed so-called "bad boy" guaranties, which required them to satisfy all outstanding obligations under the Credit Agreement upon Borrower's commission of "fraud or illegal acts." These guaranties were triggered when Borrower failed to pay payroll taxes, a violation of federal law. Neuman doubled-down on this illegal activity by submitting, as manager of Borrower, Borrowing Base Certificates which falsely represented that Borrower had paid these taxes when in fact the payroll taxes had not been paid.

Between December 2016 and January 2017, Neuman further violated the terms of the loan agreement by diverting Medicare and IGT payments from DACA-controlled accounts to a Chase account over which Capital Finance had no control. Later, on June 20, 2017, Neuman made another attempt to divert funds by instructing a hospital to direct $160,179.80 in IGT payments to a non-DACA controlled account at Santander Bank. A Show Cause Order entered by the United States District Court for the Northern District of Texas with respect to the diversion attempt was resolved by Defendants paying money to Plaintiff.

After a two-day bench trial on January 9, 2019 and January 10, 2019, and for the reasons set forth below, this Court concludes as follows:

1. By submitting false Borrowing Base Certificates to obtain loan advances, Neuman committed fraud and caused Capital Finance to incur **575,705.65** in actual damages.[1] Plaintiff is further awarded pre-judgment interest at the rate of six percent (6%) per

---

[1] This amount is included in, and therefore duplicative of, the total amount owed under the guaranty agreements.

annum and post-judgment interest at the rate of ten percent (10%) per annum. Punitive damages are warranted in the amount of **$200,000.00.**

2. Neuman diverted IGT payments and Medicare payments from the DACA-controlled accounts at Banco Popular, causing Borrower actual damages of **$414,427.22.**[2] Plaintiff is awarded pre-judgment interest at the rate of six percent (6%) per annum and post-judgment interest at the rate of ten percent (10%) per annum.

3. Rosenberg and Neuman are obligated to pay Capital Finance the outstanding obligations under the Guaranty agreements. As of January 8, 2019 that amount is **$1,304,731.37**, representing the sum of $575,705.65 in unpaid principle; $255,144.55 in default interest; $235,440.82 in legal fees (excluding fees associated with this litigation); $173,359.88 for field exam work; and $65,080.47 for lenders' monthly fees. Interest, at the default rate, continues to accrue on the unpaid balance at a per diem rate of $200.22. Plaintiff is further awarded post-judgment interest at the rate of ten percent (10%) per annum.

4. Judgment shall be ENTERED in favor of Capital Finance on Counts III and IV (Breach of Contract); Count V (Fraud); and Count VI (Conversion).

5. Rosenberg and Neuman SHALL PAY to Capital Finance a total of **$1,304,731.37**.

6. Neuman SHALL PAY to Capital Finance **$200,000.00** in punitive damages, over and above the total amount of $1,304,731.37.

Pursuant to Federal Rule of Civil Procedure 52(a), the following memorandum constitutes this Court's findings of fact and conclusions of law.

## PROCEDURAL BACKGROUND

On July 26, 2017 Capital Finance initiated this lawsuit by filing a Complaint for Confession of Judgment against Rosenberg and Neuman pursuant to Local Rule 108 (D. Md. 2018). (ECF No. 1.) On July 28, 2017, this matter was referred to Magistrate Judge A. David

---

[2] This amount is included in, and therefore duplicative of, the total amount owed under the guaranty agreements.

Copperthite for his review pursuant to 28 U.S.C. § 636 and Local Rules 301 and 302. (ECF No. 3.) On September 6, 2017, Judge Copperthite entered an Order directing Confession of Judgment in favor of Plaintiff against Defendants. (ECF No. 8.) In an accompanying Memorandum Opinion, the Magistrate Judge found that Borrower had breached its Credit Agreement with Capital Finance by "divert[ing] significant funds from being deposited into the AR Deposit Account and instead allocat[ing] said funds to an account not subject to its deposit account agreement with Capital [Finance]." (ECF No. 7, at 5.) As a result of this breach, Capital Finance was entitled to a confession of judgment against Rosenberg and Neuman pursuant to the guaranty agreements it had reached with Defendants. (*Id.* at 3-4, 5-6.)

On October 4, 2017, Rosenberg and Neuman filed a Motion to Open, Modify, or Vacate Judgment by Confession, arguing that liability had not attached to Rosenberg and Neuman because three necessary conditions enumerated in Section 1(d) of the guaranties had not occurred. (ECF No. 11.) Rosenberg and Neuman's primary argument had been, and remains, that they are not liable under the guaranties unless Borrower committed no less than three acts of egregious misconduct: collude to undergo an involuntary bankruptcy proceeding, improperly file a voluntary bankruptcy petition, and commit fraud. (*Id.* at 6.)

On November 1, 2017, Magistrate Judge Copperthite recommended that this Court deny Rosenberg and Neuman's Motions. (ECF No. 17.) He concluded that Defendants' interpretation of the contract, which they still maintain today, "makes no sense." (*Id.* at 6.) This Court adopted the Magistrate Judge's Report and Recommendation. (ECF No. 19.) On December 4, 2017, Defendants filed a Motion to Alter or Amendment Judgment, or, in the

Alternative, for Relief from Judgment and Request for Stay of Execution. (ECF No. 20.) A notice of Appeal to the United States Fourth Circuit Court of Appeals followed. (ECF No. 23.)

On April 3, 2018, this Court conducted a telephone conference with all parties. Following the telephone conference, this Court issued a Letter Order GRANTING the Defendant's Motion to Alter or Amend Judgment (ECF No. 20), VACATING the Confession of Judgment, and permitting Defendants to file a Response to Plaintiff's Complaint. (ECF No. 27.) On the following day, Defendants withdrew their Notice of Appeal. (ECF Nos. 23, 29.) In September 2018, Defendants filed an Amended Complaint (ECF No. 42), adding breach of contract claims against Rosenberg and Neuman (Counts III and IV), a fraud claim against Neuman (Count V) and a claim of conversion against Neuman (Count VI).

This Court conducted a two-day bench trial on January 9, 2019 and January 10, 2019. After the conclusion of Plaintiff's case, Defendants moved for judgment on partial findings pursuant to Rule 52(c), which this Court GRANTED IN PART and DENIED IN PART. Specifically, this Court granted Defendants' motion to dismiss the Confession of Judgment claims against Rosenberg and Neuman (Counts I and II) because this Court had previously vacated the Confession of Judgment against Defendants and permitted them to respond to the Complaint. (ECF Nos. 8, 20.) The Motion was denied with respect to the remaining claims.

The following claims proceeded to trial:

(1) Capital Finance's breach of contract claim against Rosenberg (Count III);

(2) Capital Finance's breach of contract claim against Neuman (Count IV);

(3) Capital Finance's fraud claim against Neuman (Count V);

(4) Capital Finance's conversion claim against Neuman (Count VI).

## FINDINGS OF FACT

### I. The Borrower's Business.

In early August 2015, Rosenberg and Neuman acquired eight groups of skilled nursing facilities consisting of Plano Specialty Hospital Operator LLC, Plano Healthcare Residence Operator LLC, Mesa Hills Specialty Hospital Operator LLC, Mesa Hills Healthcare Residence Operator LLC, Plum Creek Specialty Hospital Operator LLC, Plum Creek Healthcare Residence Operator LLC, Midwest City Healthcare Residence Operator LLC, and Specialty Hospital of Midwest City Operator LLC (collectively, the "Borrower"). (Stip. 1.)[3]

Rosenberg and Neuman had a 50/50 ownership interest in the Borrower. (Pl.'s Ex. 1, at CAPFI 127.) While Rosenberg and other investors advanced funds to acquire these properties, Neuman did not contribute financially. (ECF No. 100, at 43:19-24.)[4] Instead, Neuman assumed the day-to-day operations of the company, drawing on his years of experience in the industry. (ECF No. 102, at 64:2-10; 97:21–23.) He acted as the Borrower's main point of contact with Capital Finance; Jeffrey Stein, its Executive Managing Director, spoke with him regularly. (ECF No. 101, at 50:3-4; 67:7-11.)

Government programs like Medicare and Medicaid constituted significant payor sources for the services that Borrower rendered. (ECF No. 100, at 7:1-8.) Payments from the Medicare program flowed into the bank account designated by the facilities. (ECF No. 99, at

---

[3] "Stip." refers to stipulations contained in the Pretrial Order. (ECF No. 92.)
[4] The trial transcript appears at ECF Nos. 99, 100, 101, and 102.

8:19-25.) Pursuant to a government program, the Borrowers received intergovernmental transfer payments ("IGT" payments) through its partnership with Childress County Hospital. (ECF No. 101, 54:2-6.) Mr. Young testified that the appropriate government entity would remit these payments to a bank account associated with Childress County Hospital, which would in turn disburse these funds to the Borrowers. (ECF No. 101, at 58:11-18.)

## II. Capital Finance's Services in the Healthcare Industry.

Capital Finance provides working capital financing to healthcare service providers through revolving lines of credit. (ECF No. 99, at 50:14-15.) Because skilled nursing facilities experience significant delays between billing for services and receiving Medicare and Medicaid payments, revolving lines of credit ensure that these facilities have the working capital necessary to support their operations. (*Id.* at 50:15-51:1.) To ensure the that its loans are repaid, Capital Finance assumes the facilities' accounts receivable and related assets as collateral. (*Id.* at 51:5-9.) In practice, Capital Finance designates bank accounts to which the proceeds of its collateral must be paid, so that it may perfect its interests in these funds. (*Id.* at 51:9-14). When these funds enter the protected accounts, they are used to pay down the borrower's loan obligations. (*Id.* at 51:15-18.)

## III. The Credit Agreement and its Terms.

On July 1, 2015, Capital Finance entered into a Credit and Security Agreement (the "Credit Agreement") with Borrower (Stip. 1; Pl.'s Ex. 1.) The Credit Agreement provided for a revolving credit financing facility to Borrower for operation of Borrower's facilities (Pl.'s Ex. 1), which is evidenced by a Revolving Loan Note (as amended) in a maximum amount of $9,000,000.00 (Stip. 2). As the manager of each Borrower, Neuman executed the Credit

Agreement and the Revolving Loan Note on their behalf. (Pl.'s Exs. 1, 2.) Capital Finance's Executive Managing Director, Jeffrey Stein, negotiated the terms of this credit agreement with Mr. Neuman. (ECF No. 99, at 55:8-15.) Both parties were represented by counsel. (*Id.* at 55:16-19.)

Pursuant to Section 9.1 of the Credit Agreement, Borrower granted Plaintiff a lien and security interest in, *inter alia*, all of Borrower's accounts and money (the "Collateral"). (Pl.'s Ex. 1; ECF No. 100, at 44:6–25.) Borrower agreed, in Section 2.9(a) and (f) of the Credit Agreement, to ensure that all Collateral would be paid directly from its account debtors into designated accounts controlled by a deposit account control agreement ("DACA"). Borrower was prohibited from using any other bank account for collection of its accounts. (ECF No. 99, at 59:5–17, 61:24–62:7; Pl.'s Ex. 1, at CAPFI-31 § 2.9(a).) Mr. Neuman testified that he understood this requirement. (ECF No. 100, at 45:18-21.)

The Credit Agreement contained many additional provisions designed to ensure the repayment of Capital Finance's loans and protect Plaintiff in the event of default. Mr. Neuman, who had years of experience in this industry, indicated that he reviewed this document "very carefully." (ECF No. 100, at 44:3-5.) At trial, he expressed familiarity with its terms. (*Id.* at 44:6-22.)

Capital Finance of course charged interest for its loans. Under the Credit Agreement, it assigned a base interest rate tied to the LIBOR rate.[5] (ECF No. 99, at 58:9–24.) In the event

---

[5] The London Interbank Offered Rate, or "LIBOR" rate, is a fluctuating benchmark interest rate used by banks around the world.

of default, the contract penalizes the Borrower with a heightened interest rate of an extra five percent (5%) per annum above the base rate. (*Id.* at 64:1–6; Pl.'s Ex. 1, CAPFI 70 § 10.3.)

Article 4 of the Credit Agreement contains numerous affirmative covenants governing Borrower's use of funds. More than one provision explicitly requires Borrow to pay its taxes. Section 4.2, titled "Payment and Performance of Obligations" requires Borrower to "pay and discharge, and cause each Subsidiary to pay and discharge, at or before maturity, all of their respective obligations and liabilities, including tax liabilities." (Pl.'s Ex. 1, at CAPFI 43.) Section 4.4(b) similarly governs the payment of taxes, providing that "Borrower will, and will cause each subsidiary to, pay or cause to be paid all Taxes at least five (5) days prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed." (Pl.'s Ex. 1, at CAPFI 43.) Mr. Stein testified that it was "critical" that Borrowers remain current on their obligations, including payroll taxes, because the IRS could "prime" Capital Finance's liens. (ECF No. 99, at 52:16–21, 60:23-61:5, 73:25–74:7.) In other words, tax liens by the IRS can assume priority over the liens of secured creditors, potentially limiting creditors' ability to collect on their collateral in the event of default.

Article 10 governs events of default and is designed to ensure that Borrower used its capital wisely and protected Capital Finance's ability to enforce its contract. Section 10.5, "Application of Proceeds" governs the borrower's ability to direct payments following an event of default. (Pl.'s Ex. 1, at CAPFI 70.) Capital Finance understood this provision to require Borrowers to continue proper billing and collection processes in accordance with the credit agreement. (ECF No. 99, at 64:13-17.)

Article 11, Section 11.1 holds Borrower liable for all costs and expenses incurred by Plaintiff in connection with any litigation, dispute, suit or proceeding relating to the Credit Agreement and the guaranties and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under the Credit Agreement and/or the guaranties. (Pl.'s Ex. 1, at CAPFI-73 § 11.1(c)–(d); ECF No. 99, at 65:9-15.)

> Finally, Section 12.2, "No Waivers" provides that:
>
> No failure or delay by Agent or any Lender in exercising any right, power, or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.
>
> (Pl.'s Ex. 1, at CAPFI 75.)
>
> Mr. Stein testified that this provision acted as another means of ensuring that

Capital Finance had not waived any right by waiting to enforce its remedies. (ECF No. 99, at 65:16-23.)

Pursuant to the Credit Agreement, funds were advanced to Borrower based on its representations that it was in compliance with the Credit Agreement and had paid all applicable taxes. With these conditions satisfied, Capital Finance would advance funds representing a percentage of the Borrower's eligible collateral, which included the Borrowers' eligible accounts receivable. (ECF No. 99, at 73:2-11.) This process is memorialized in the Credit Agreement, which explicitly requires Borrower to submit Borrowing Base Certificates as a condition precedent to receiving loans. (ECF No. 99, at 57:8–58:1; Pl.'s Ex. 1, at 7.) Specifically, the contract provides that a "Responsible Officer of Borrower" must execute a certificate "appropriately completed and substantially in the form of Exhibit A" to the

agreement. (Pl.'s Ex. 1, at CAPFI 6; ECF No. 99, at 57:8-15.) Page three of this form contains a disclaimer of personal liability. (Pl.'s Ex. 1, Ex. A, at CAPFI 109.)

Although the parties had the option to use an exact duplication of Exhibit A as the Borrowing Base Certificate, they opted to use a one-page form instead. The disclaimer language does not appear in the form that Borrower and Capital Finance exchanged throughout the life of the loan. (*compare* Pl.'s Ex. 1, Ex. A, at CAPFI 109 *with* Pl.'s Exs. 15, 16.) Consistent with the parties' choice to use an alternative form, Mr. Stein testified that he would not have signed a contract that knowingly waived Capital Finance's right to remedy acts of fraud. (ECF No. 99, at 66:20-23.)

In lieu of a disclaimer, the following affirmation appears on the Borrowing Base Certificates:

> Borrower, by the execution of this Report: (a) Hereby ratifies, confirms, and affirms all of the terms, and further certifies that the Borrower is in compliance with the Loan Documents as of the date hereof and (b) Hereby certifies that the Borrower has paid all State and Federal payroll withholding taxes immediately due and payable.

(Pl.'s Exs. 15, 16.)

Mr. Stein testified that the Borrowing Base Certificates specially identify the payment of payroll withholding taxes because these payments are "critical" due to the risks of losing collateral based on the government's ability to prime Plaintiff's liens. (ECF No. 99, at 52:16–21, 73:25–74:7.)

**IV. The Deposit Account Control Agreement and its Terms.**

DACAs are a critical component of Capital Finance's lending relationships. (ECF No. 101, at 55:14–16; ECF No. 99, at 52:6–15, 73:12-19.) As Mr. Young testified, these types of accounts are common in the healthcare lending industry because they protect and preserve the proceeds of the borrowers' collateral and facilitate loan payments. (ECF No. 101, at 55:3-13.) Mr. Stein explained that DACAs are "critical" because they constitute the primary means by which Capital Finance perfects its security interest in funds received by borrowers. (ECF No. 99, at 52:6–15; 73:17-19.) Mr. Neuman was apprised of these facts; during his testimony, he indicated that he understood that Capital Finance would be "in a worse position" if funds were deposited into accounts other than the DACA-controlled accounts. (ECF No. 100, at 46:5–9.)

On July 1, 2015, Borrower, Plaintiff, and Banco Popular North America ("Banco Popular") entered into a DACA. (Pl.'s Ex. 24.) Pursuant to this agreement and the Credit Agreement, this Banco Popular account constituted the DACA-controlled account into which all proceeds of Capital Finance's collateral were to flow. Any funds received by Borrower into an account other than the Banco Popular accounts had to be immediately remitted to Plaintiff from July 1, 2015 forward. (ECF No. 99, at 60:2–12; Pl.'s Ex. 1, CAPFI-2 § 1.1 (definition of "Accounts") and CAPFI-32 § 2.9(f).) The Credit Agreement provides that Borrower's failure to observe or perform any covenant contained in Section 2.9 constitutes an Event of Default. (Pl.'s Ex. 1, at CAPFI-6 § 10.1(b)).

Neuman ultimately acknowledged that the Credit Agreement defined the term "Accounts" to provide for any right to payment of a monetary obligation, whether or not earned by performance. (ECF No. 100 72:1-7; Pl.'s Ex. 1 at CAPFI 2.) Consistent with this

definition, both intergovernmental transfer payments ("IGT payments") and Medicare payments constituted a portion of the collateral for Capital Finance's loans. (ECF No. 101 54:2–16; ECF No. 99, at 83:23-84:4; Pl.'s Ex. 1 at § 1.1 (definition of "Accounts") and § 9.1.) During his testimony, Neuman acknowledged that Medicare payments were "definitely part of accounts receivable." (ECF No. 100, at 48:20-22.) In accordance with this understanding, and the terms of the Credit Agreement, Borrower was required to deposit IGT and Medicare payments into DACA-controlled accounts at Banco Popular.

## V.     The Guaranty Agreements and their Terms.

In accordance with its usual practice, Capital Finance required Rosenberg and Neuman to execute personal guarantees to obtain a revolving line of credit. (Pl.'s Exs. 3, 4; ECF No. 99, at 69:18-20.) On June 26, 2015 both Defendants signed identical guaranty agreements. (Pl.'s Exs. 3, 4.) They did so according to their own free will and without coercion or duress. (Stip. 7.) The guaranties explicitly state, and testimony confirms, that they were a condition precedent to receiving loans. (Pl.'s Exs. 3 & 4 (first WHEREAS clause); ECF No. 102, at 63:17–20.) At trial, Rosenberg agreed that "Capital Finance would not make the loan" without these guaranties. (EF No. 102, at 63:17-20.)

The guaranties that Rosenberg and Neuman signed are so-called "bad boy guaranties," which trigger upon Borrower's commission of certain acts of misconduct. Section 1(d) of the guaranties lists three events, any one of which would trigger liability under the agreements. Specifically, Section 1(d) provides:

> Notwithstanding any provision herein to the contrary, Agent acknowledges that this Guaranty and the Guaranteed Obligations hereby shall only be applicable

and enforceable against the Guarantor in the event that: (a) Borrower colludes with other creditors in causing an involuntary bankruptcy or insolvency proceeding involving any of the Credit Parties in an effort to circumvent, avoid or impair the rights of Agent or the Lenders, (b) a voluntary bankruptcy filing by Borrower to the extent that a court of appropriate jurisdiction determines that such filing was made otherwise than in accordance with applicable law, and (c) any act of fraud or other illegal action taken by Borrower or any Credit Party in connection with the Credit Agreement or any other Financing Document.

(Pl.'s Exs. 3 at 2, 4 at 2.)

In sum, the section references three events which would trigger liability on the part of the Borrowers: (1) an improper involuntary bankruptcy; (2) an improper voluntary bankruptcy; and (3) fraud or other illegal actions.

Mr. Stein explained that this type of provision is "widely used and designed to incentivize[] the principals of the Borrowers to act in accordance [with] the credit agreement." (ECF No. 99, at 70:16-23.) In Stein's experience, it would be highly unusual for all three conditions mentioned in the provision (i.e., an involuntary bankruptcy, a voluntary bankruptcy, and fraud or illegal action) to occur. (ECF No. 99, at 71:21-23.) Accordingly, Stein understood the provision to require the occurrence of only one of the three conditions precedent listed (ECF No. 99 71:3-72:1.) While the first two events (involuntary and voluntary bankruptcy filings) were "important" triggers, the third event was the key, as it "incentiviz[ed] the principal of the borrowers to live up to the credit agreement." (ECF No. 99, at 71:23-25.) This Court specifically finds that Mr. Stein was a credible and honest witness. His understanding is the only logical interpretation of the guaranties of Rosenberg and Neuman. Furthermore, any testimony of Neuman and Rosenberg suggesting that they

believed all three criteria must be met was simply not credible at trial. In particular, Neuman was not a credible witness.

Pursuant to the guaranties, each Defendant unconditionally and irrevocably (i) guaranteed to Plaintiff the prompt and complete payment and performance when due of all obligations under the Credit Agreement and (ii) agreed to pay all costs and expenses incurred by Plaintiff (including the reasonable fees and disbursements of counsel and other professionals) in connection with Plaintiff enforcing or defending its rights under the guaranties and collecting the obligations (collectively, the "Guaranty Obligations"). (Pl.'s Exs. 3 & 4, at § 1(a).)

These guaranty agreements contained several provisions drafted to ensure that Rosenberg and Neuman could not assert various defenses to the enforcement of the guaranties.

Section 2, "Guaranty Absolute" provides that:

The liability of the Guarantor under this Guaranty shall be absolute and unconditional irrespective of . . . any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations . . . [and] any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Borrower, the Guarantor, or any other guarantor.

(Pl.'s Ex. 4, at CAPFI 197-98.)

Section 3, "Waiver" states that "Guarantor hereby waives . . . any requirement that the Agent or Lenders . . . exhaust any right to take any action against any Borrower or any other Person or any of the Collateral." (Pl.'s Ex. 4, at CAPFI 198.)

## VI.      The Borrowers Diverted Funds and Failed to Pay Taxes.

In the fall of 2016, Capital Finance became aware that the Borrowers were having financial difficulties. (ECF No. 99, at 74:13-22.) Around this time, Capital Finance representatives attended a meeting with Borrowers and learned that Borrowers had closed two of the eight facilities without notifying them. (ECF No. 99, at 75:5-6.) Concerned about the financial health of the Borrowers, Capital Finance retained Breslin, Young & Slaughter ("Breslin Young"), an experienced financial consulting firm. (Pl.'s Ex. 17; ECF No. 101, at 36:21-22; ECF No. 99, at 18:16-19; 75:12-19.) Prior to its retention, Capital Finance had worked with Breslin Young for about fifteen years. (ECF No. 101, at 36:6-7.) The firm specializes in performing field exams for commercial lenders in the healthcare industry to assess the financial health of their borrowers. (ECF No. 101, at 35:4-14.)

Between November 1 and 3, 2016, Breslin Young performed an on-site field examination of the Borrowers at the Concord Healthcare Group Facility. (ECF No. 101, at 36:21-22; ECF No. 99, at 18:16-19.) On December 9, 2016, Breslin Young provided a field exam report to Capital Finance which recorded their findings. (Pl.'s Ex. 17; ECF No. 99, at 18:21-23.) Mr. Young testified that the field exam yielded several disturbing revelations. Instead of directing accounts receivable to DACA controlled accounts at Banco Popular, Borrowers had diverted funds to Chase bank accounts. Borrowers had also failed to pay payroll withholding taxes and provider taxes.

The evidence clearly establishes that Neuman authorized the unlawful diversions uncovered by the field exam. At trial, he admitted that he was the day-to-day manager of Borrower. (ECF No. 102 64:2–10.) Neuman and Rosenberg were the only signatories to the bank accounts for each of the eight Borrower entities. (ECF No. 102, at 70:22–71:3, 75:6-12;

ECF No. 100, at 46:19–47:9.) Rosenberg, who had a hands-off role in the venture, denied making the wrongful transfers. (ECF No. 102, at 64:7-10; 71:1-72:21.) Although Neuman also denied diverting Medicare and IGT payments to Chase accounts, his deposition testimony indicated that he was "authorizing every disbursement" from the Borrower accounts and signed off on disbursals as small as $75.00. (ECF No. 100 46:10-47:4.) Accordingly, the clear evidence compels this Court to reject Neuman's claim and find that he personally authorized the unlawful transfers.

### A. Borrower illegally failed to pay payroll withholding taxes and provider taxes, then fraudulently represented that it had satisfied its tax withholding requirements.

The evidence shows that Borrower illegally failed to pay payroll withholding taxes. The field exam revealed that Borrower was delinquent in paying payroll and provider taxes. (ECF No. 99, 19:8-25, 21:3-5, 21:25-22:15.) Having analyzed tax forms, payroll reports, and bank statements for two of Borrower's facilities and corresponded with Matt Weisz, an employee of Concord Healthcare Group acting on behalf of Borrower, Breslin Young concluded that Borrower was delinquent in payment of $251,000 in payroll taxes that should have been paid on November 10, 2016, November 17, 2016, and December 2, 2016. (ECF No. 99, at 19:7-25, 20:24–21:10, 33:5–11.) Additional evidence and testimony confirms payroll tax deficiencies. On December 11, 2016, Mr. Neuman informed Plaintiff that Borrower actually had a payroll tax liability of $400,000.00. (Pl.'s Ex. 13; ECF No. 99, at 79:6–80:10.) He later informed Rosenberg that as of January 2017, Borrower owed over one million dollars in payroll taxes. (ECF No. 102, at 65:13–66:4.) Borrower's 941s also show that Borrower became

delinquent on its payroll taxes in the fourth quarter of 2016. (ECF No. 100, at 18:21–25, 19:12–20; Pl.'s Exs. 19 & 20.)

This evidence is undisputed. At trial, Mr. Rosenberg admitted that there were unpaid payroll taxes as of December 2016. (ECF No. 102, at 77:13-15.) Neuman also admitted that payroll taxes were not paid on time. (ECF No. 100, at 19:23-20:9.) Defendants' expert, Jared Jordan, did not challenge Brian Young's conclusions concerning the failure to pay payroll withholding taxes. This fact in and of itself triggered the liability of Neuman and Rosenberg as personal guarantors.

Nevertheless, in early December 2016, Borrower submitted a series of Borrowing Base Certificates, each of which was signed by Neuman and certified that Borrower was current in paying its payroll taxes. (ECF No. 99, at 78:9–19; ECF No. 102, at 77:16–79:1; ECF No. 100, at 49:11-14; Pl.'s Ex. 15.[6]) As the evidence reveals, these representations were not true. Rosenberg acknowledged this when he testified that some of the statements submitted in the Borrowing Base Certificates were false. (ECF No. 102, at 79:20–23.) Although Capital Finance was aware that Borrower was facing financial difficulty, it did not know that Borrower was delinquent in paying payroll taxes until it received the Breslin Young report on December 9, 2016. (ECF No. 99, at 22:23-23:2.) In reliance on Neuman's representations on the Borrowing Base Certificates that Borrower was current on its payroll tax obligations, Capital Finance advanced Borrower "in excess of a million" dollars in the weeks leading up to its receipt of the field exam report. (ECF No. 99, at 78:20–79:5.)

---

[6] Exhibit 15 is incorrectly identified as Exhibit 16 in the trial transcript at 78:9.

Between July 26, 2016 and September 30, 2016, Borrower submitted twenty Borrowing Base Certificates, all signed by Neuman, which falsely certified that Borrower was in compliance with the Credit Agreement. (Pl.'s Ex. 16; ECF No. 99, at 81:8-16.) Young concluded, however, that Borrower had not paid $68,000 in provider taxes from July through September 2016. (ECF No. 99, at 21:21–22:22.) He reached this conclusion based on Borrower's inability to provide any evidence of these payments. (*Id.* at 22:4-18.) Defendant's rebuttal expert, Jared Jordan, testified that Young should not have reached this conclusion based on an absence of evidence. (ECF No. 100, at 93:6-93.) This lack of evidence, coupled with Borrower's admission that it could have provided this information had it existed, leads this Court to conclude that Borrower had not paid provider taxes and misrepresented this fact on Borrowing Base Certificates. (ECF No. 99, at 27:11-15, 32:18-20, 81:17–21; ECF No. 100, at 19:19-22, 33:2-4, 41:4-7.) Had Capital Finance known that the provider taxes were not paid in July 2016, it would have had a better chance of recovering on its loan. (ECF No. 99, at 82:14-17.)

The alarming revelations in the report spurred Capital Finance to action. On December 12, 2016, Capital Finance sent Borrower a notice of default, thereby accelerating the payments of the loans, and demanded payment in full of the outstanding amounts due under the Credit Agreement. (Pl.'s Ex. 5; ECF No. 99, at 82:18–25; ECF No. 100, at 54:14-16.) On December 13, 2016, BenchMark became the new operator of Borrower. (ECF No. 101, at 37:16-18; 69:5-9).

**B. Borrower, under the direction of Neuman, diverted IGT Payments from DACA-controlled accounts.**

On December 12, 2016, Capital Finance re-engaged Breslin Young to help reconcile funds. (ECF No. 101, at 55:21-56:4). Pursuant to this engagement, Breslin Young provided another report which revealed that IGT payments totaling $288,793.05 were wired to a Chase account over which Plaintiff had no control. (ECF No. 101, at 57:24–59:9, 70:14–71:14; Pl.'s Ex. 18, at CAPFI-445.) These highly suspicious wire transfers represented a marked deviation from Borrower's ordinary practice of depositing funds into the DACA-controlled Banco Popular accounts through automated transfers. (ECF No. 101 58:19-24; Pl.'s Ex. 18, at CAPFI-445.) The wire payments indicate that Neuman, the overseer of Borrower's day-to-day activities and bank transfers, had deliberately diverted funds from their proper accounts.

Prior to this discovery, Capital Finance was not aware that Borrower was using Chase for deposits of collateral. (ECF No. 99, at 62:8–11.) Subsequently, Plaintiff demanded repayment of the funds. (*Id.* 59:10-18, 84:8-14.) Although Mr. Neuman acknowledged that any funds not paid to the Banco Popular accounts were to be immediately remitted there, Borrower only repaid $118,587.53 of the diverted funds. (ECF No. 100, at 56:8-57:9; ECF No. 101, at 66:17–67:10; 67:10–11; Pl.'s Ex. 18 at CAPFI-454 & 456.)

On January 26, 2017, Plaintiff sent another letter to Borrower, addressed to Neuman, demanding return of the remaining IGT payments. (Pl.'s Ex. 29; ECF No. 99, at 84:18–85:11.) Neuman responded to Plaintiff confirming the funds had been sent to the Chase account and did not dispute that the funds were IGT payments. (Pl.'s Ex. 14.) The remaining $170,205.52 of IGT payments was never repaid. (ECF No. 99, at 9:5–14, 86:10–14; Pl.'s Ex. 18, at CAPFI-438.)

On June 20, 2017, Mr. Neuman and counsel for Borrower instructed a hospital to direct $160,179.80 in IGT payments to Santander Bank, a non-DACA controlled account. (Pl.'s Ex. 22; ECF No. 99, at 92:18–93:7, 96:19-97:9; ECF No. 100, at 65:7-13.) The money was, however, ultimately paid to Plaintiff. (ECF No. 102, at 4:16-5:1.) A show-cause order entered by the United States District Court for the Northern District of Texas with respect to the diversion attempt was resolved by Defendants paying money to Plaintiff. (ECF No. 100, at 64:23-65:5; 70:5-23.)

## C. Borrower, under the direction of Neuman, diverted Medicare payments.

In 2016, $2,836,271.57 of Medicare payments were deposited into the Chase accounts. (ECF No. 99, at 15:17-19; Pl.'s Ex. 18, at CAPFI-440.)  Breslin Young could not trace any of those payments being transferred to Capital Finance as required. (ECF No. 99, at 15:22-16:10.) Between December 14, 2016 and January 26, 2017, $443,695 in Medicare payments were deposited into Borrower's Chase accounts. (ECF No. 99, at 9:21–10:17.) Upon discovery, Breslin Young demanded return of the Medicare payments to Plaintiff. (Pl.'s Ex. 25, at CAPFI-309; ECF No. 99, at 13:18–21.) On February 1, 2017, Borrower repaid $199,473.30 of diverted Medicare funds to Plaintiff. (Pl.'s Ex. 18, at CAPFI-439; CAPFI-473-477.)  No evidence supports a finding that Plaintiff accepted this partial payment in lieu of full satisfaction of the amounts owed.

The remaining $244,221.70 of diverted Medicare funds was never paid to Plaintiff or accounted for by Borrower. (ECF No. 99, at 14:7–19, 90:5–11.)  Mr. Neuman does not dispute that Borrower's failure to repay the remaining payments negatively impacted Plaintiff because money would have gone to repay Borrower's loan balance if the funds had been deposited in

the correct account. (ECF No. 99, at 14:20–15:1; ECF No. 100, at 46:5-9.) These repayments were critical because no new accounts were generated by Borrower after December 12, 2016. (ECF No. 99, at 39:16-40:5; ECF No. 102, at 58:17-59:2.)

## VII.    Amounts Due to Agent and Lenders.

On June 8, 2018, Plaintiff demanded payment from Defendants under the guaranties. (Pl.'s Ex. 6.) Prior to sending the letters, Plaintiff tried to exhaust its efforts to collect on Borrower's receivables before suing the individual guarantors. (ECF No. 99, at 91:20–92:13.) As of January 8, 2019, the amounts outstanding to Plaintiff under the Credit Agreement are: $575,705.65 in unpaid principle; $255,144.55 in default interest; $235,440.82 in legal fees (excluding fees associated with this litigation); $173,359.88 for field exam work; and $65,080.47 for lenders' monthly fees. (Pl.'s Ex. 23; ECF No. 99 101:10-103:16.) Interest, at the default rate, continues to accrue on the unpaid balance at a per diem rate of $200.22. (*Id.*) Defendants presented no challenge to these amounts at trial.

## CONCLUSIONS OF LAW

The parties agree that Maryland law applies in this case. (ECF No. 101, at 51:3-6.) Accordingly, this Court refers to Maryland law to resolve the breach of contract, fraud, and conversion claims.

## I.    Rosenberg and Neuman are liable for Breach of Contract under Counts III and IV.

Under Counts III and IV, Capital Finance alleges that Rosenberg and Neuman are liable for breach of the guaranty agreements by failing to pay the amounts owed under these guaranties. (ECF No. 42, at ¶¶ 98, 106.) To prevail on a claim for breach of contract under Maryland law, a party must prove the existence of a contractual obligation, a material breach

of that contractual obligation, and resulting damages. *Kumar v. Dhanda*, 198 Md. App. 337, 345, 17 A.3d 744 (2011). Rosenberg and Neuman are liable for breach of contract because Borrower's fraudulent misrepresentations on the Borrowing Base Certificates, as well as its failure to pay payroll taxes, triggered liability under the guaranties. As Rosenberg and Neuman have not satisfied their payment obligations under the guaranties, they are liable for breach of contract.

## A. Section 1(d) of the Guaranties must be read in the disjunctive.

In this case, Defendants Rosenberg and Neuman have based their defense on the argument that all three events listed in Section 1(d) of their respective guaranties must have occurred. It is undisputed that two of the three events—an involuntary bankruptcy and/or a voluntary bankruptcy—did not occur. This results in the rather unique argument that Rosenberg and Neuman were free to commit fraud or other illegal actions with no liability on their personal guaranties. There is simply no basis for this Court to accept this strained and illogical argument. The three events listed in Section 1(d) (*i.e.*, involuntary bankruptcy, voluntary bankruptcy, and fraud or other illegal actions) must be read in the disjunctive, requiring only that the Borrower commit fraud or other illegal actions to trigger liability.

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Kantsevory v. LumenR LLC*, 301 F. Supp. 3d 577, 594-95 (D. Md. 2018) (Hollander, J.) (quoting *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 334-35 (2017) (citation and internal quotation marks omitted). "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (alteration omitted) (quoting

*Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344 (2006)).  To determine the parties'
intentions, courts look first to the written language of the contract.  *Walton v. Mariner Health of
Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("Generally, when seeking to
interpret the meaning of a contract our search is limited to the four corners of the
agreement.").

As a first step in this analysis, this Court must "determine from the language of the
agreement what a reasonable person in the position of the parties would have meant at the
time the agreement was effectuated." *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs. Ltd.
P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153
(1997).  Critical to this inquiry in an examination of "the character of the contract, its purpose,
and the facts and circumstances of the parties at the time of execution." *CX Reinsurance
Company Limited v. Heggie*, ELH-15-1674, 2016 WL 6025488, at *6 (D. Md. Oct. 14, 2016)
(quoting *United Services Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006).
Moreover, this Court need not consult extrinsic evidence when, as here, a contract is
unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin
Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). "A written contract is
ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one
meaning." *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (citation omitted).

Maryland law recognizes that the word "and" may unambiguously require a disjunctive
reading in light of the character of the contract in which it appears.  In *Bankers & Shippers Ins.
Co. v. Urie*, 38 Md. App. 232, 380 A.2d 243 (Md. Ct. Spec. App. 1977), the Maryland Court of
Special Appeals confronted a contract which insured an aircraft to be piloted by "Paul

Erickson and Wilford Goldman." *Bankers*, 38 Md. App. at 234, 380 A.2d at 244. The Defendant contended that the insurance policy should be read in the conjunctive to require both Erickson and Goldman to be at the controls of the plane for the policy to apply. *Id.* at 248. The Court rejected this argument, finding no ambiguity in the contract. *Id.* The conjunction "and" had "only one clear an unambiguous meaning to any reasonable person, and that is that 'and' was used in the disjunctive sense to mean 'or.'" *Id.* at 248. While a conjunctive reading of the provision was certainly possible—there were dual controls, after all—requiring both pilots to fly the plane would court disaster as they wrestled for control of the vehicle. *Id.* The Court, mindful of the nature of the contract before it, refused to read it in a manner which would encourage aviation catastrophes. *See also Fidelity & Deposit Co. of Maryland v. Mattingly Lumber Co.*, 176 Md. 217, 4 A.2d 447 (Md. 1939) (interpreting the word "and" in a contractor's bond to be in the disjunctive)

Conversely, the word "or" may require a conjunctive reading. An assignment contract in *Jeffrey Sneider-Maryland v. Mattingly Lumber Co.*, 282 Md. App. 229, 345 A.2d 79 (Md. Ct. Spec. App. 1975) warranted that a "sewer is or will at settlement be available." *Id.* at 231. When the sewer was not available to service the property at the time of settlement, Sneider sued. *Id.* at 232. The lower court determined that it was proper to read this phrase in the disjunctive, such that the availability of a sewer at the time of the Assignment satisfied the warranty provision at issue. The Maryland Court of Special Appeals disagreed and found that a conjunctive reading was more appropriate. *Id.* at 234. Examining the "plain meaning" of the contract's terms, and without resorting to extrinsic evidence, the Court determined that the agreement contemplated that the sewer would be available at settlement, not merely at the time the

Assignment was executed. *Id.* at 240-41. A conjunctive reading, which would render the warranty satisfied at the time it was made, would be "illogical." *Id.* at 241.

Section 1(d) is not ambiguous and the Defendants' argument would render their personal guaranties meaningless. Considering the character of the guaranties and the context in which they were entered, as Maryland case law requires, this provision must be read in the disjunctive. As Mr. Stein testified, "bad boy" guaranties, like the one memorialized in Section 1(d), are widely used to "incentivize[] the principals of the borrower to act in accordance to the credit agreement." (ECF No. 99, at 70:20-23.) *See also Credit Alliance Corp. v. Williams*, 851 F.2d 119, 122 (4th Cir. 1988) ("The very purpose of a guaranty is the assure the [creditor] that in the event that the [debtor] defaults, the [creditor] will have someone to look to for reimbursement."); *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 49 n.1 (2d Cir. 2016) ("bad boy guarantees . . . permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral"). A bad boy guaranty which remains unenforceable until Borrower engages in an implausible triad of egregious conduct, any one of which would seriously inhibit the lender's access to collateral, does not provide this sort of incentive—it is not a guaranty at all.

Defendants have argued that all three events listed in Section 1(d) must occur for liability to arise under the guaranties. Defendants maintain that this reading makes sense because a single entity may undergo both voluntary and involuntary bankruptcy proceedings. *See, e.g., In re Caesars Entertainment Operating Company, Inc.,* 2015 WL 495259, at *2-3, 9 (Bankr. D. Del.) (settling a venue dispute concerning a debtor who, faced with an involuntary bankruptcy proceeding in Delaware, filed a voluntary bankruptcy petition in Illinois).

Moreover, because the term "Borrower" and "Credit Agent" are collective terms referring to several entities and individuals, liability under the guaranties might arise if one Borrower colludes to undergo an involuntary bankruptcy, another Borrower files for bankruptcy, and one or both entities commit fraud.

Simply because Defendants' reading is theoretically possible, however, does not mean it is one that a reasonable person in the parties' position would acknowledge. The *Banker & Shippers* Defendant's interpretation of the disputed contact was *possible* because the plane had two sets of controls, and nothing prevented the *Credit Alliance* Defendant from making a warranty about the status of the sewer at the time of assignment. Nevertheless, the Maryland courts rejected these interpretations because they eschewed the purpose and character of the contracts. This Court rejects Defendants' strained interpretation. The purpose of a "bad boy" guaranty is to discourage bad acts. The ones Rosenberg and Neuman signed were designed to provide further assurances of proper conduct on behalf of the Borrower. An interpretation of Section 1(d) which would permit Borrowers to commit flagrant acts of fraud completely ignores the purpose of the guaranties and must be rejected. Accordingly, Borrower's commission of fraud or other illegal acts triggers liability under the guaranties.

### B. Borrower committed fraud and other illegal acts.

Rosenberg and Neuman are liable under the guaranties because Borrower engaged in "fraud or other illegal action." Defendants' contract liability would arise had Borrower committed any single act of fraud or illegal activity, but evidence at trial showed that Borrower committed at least two such recurring acts, namely: (a) failing to pay payroll taxes; and (b) committing fraud by submitting false Borrowing Base Certificates. In Part II of its

Conclusions of Law, this Memorandum Opinion concludes that Neuman committed fraud by submitting false Borrowing Base Certificates. As such, this Section will only discuss liability arising from the Borrower's undisputed failure to pay payroll taxes. Mr. Neuman's commission of fraud, however, provides an additional basis for liability under the guaranty agreements because Neuman acted in part as Borrower's manager when he signed false Borrowing Base Certificates.

It is clearly illegal to fail to pay payroll taxes. *See* 26 U.S.C. § 7202 (providing it is a felony to fail to truthfully pay over any tax required to be collected under Title 26, which includes 26 U.S.C. § 3404 (liability for employee withholding tax)). Under § 7202, willful means a voluntary, intentional violation of a known legal duty. *Cheek v. United States*, 498 U.S. 192, 201 (1991). Bad faith or a bad purpose are not required to demonstrate a violation of this law. *See Cheek*, 498 U.S. at 201 (requiring only "an intentional violation of a known legal duty"). A person's inability to pay the tax does not absolve him of criminal liability for failing to do so. *United States v. Lord*, 404 F. App'x 773, 779 (4th Cir. 2010) ("paying wages and . . . satisfying debts to creditors in lieu of remitting employment taxes to the IRS, constitute circumstances evidence of a voluntary and deliberate violation of § 7202").

Breslin Young's analysis concluded that Borrower was delinquent in payment of $251,000 in payroll taxes that should have been paid on November 10, 2016, November 17, 2016, and December 2, 2016. (ECF No. 99 19:7-25, 20:24–21:10, 33:5–11.) At trial, both Defendants admitted that payroll withholding taxes were not paid. (ECF No. 102, at 77:13-15; ECF No. 100, at 19:23-20:9.) By failing to pay payroll withholding taxes, Borrower violated

the law.  Borrower's persistent failure to meet its tax obligations was sufficient to trigger liability under the bad boy guaranties.

### C. Defendants have failed to meet their burden to prove any affirmative defense.

Defendants bear the burden of proving an affirmative defense.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *CSX Transp., Inc. v. Pitts*, 430 Md. 431, 449, 61 A.2d 767, 778 (Feb. 28, 2013).  This Court finds that Defendant has failed to meet its burden on any affirmative defense.

Many of Defendants' affirmative defenses are explicitly foreclosed by the agreements they signed.  The "No Waiver" section of the Credit Agreement and the "Guaranty Absolute" provision of the guaranties foreclose the affirmative defenses of equitable estoppel, waiver, release, and laches.  Additionally, Defendants cannot prevail on their claim that Plaintiff failed to comply with Md. Code, Commercial Law §§ 9.625-626.  Pursuant to Section 3 of the guaranty, Defendants each agreed that Capital Finance need not collect against the Collateral before collecting against each Defendant.

Moreover, the affirmative defenses of equitable estoppel and waiver required Defendants to show that Capital Finance promised, by words or conduct, to forgo enforcement of the contract.  *From the Heart Church Ministries, Inc. v. Philadelphia-Baltimore Annual Conference*, 184 Md. App. 11, 48-51, 964 A.2d 215, 237-239 (Md. Ct. Spec. App. 2009).  Capital Finance made no such representations.  Even if Capital Finance made oral promises to work with Defendants with respect to their defaults, these promises are unenforceable.  *Howard Oaks, Inc. v. Maryland Nat'l Bank, et al.*, 810 F. Supp. 674, 676-677 (D. Md. 1993) ("any

assurances, oral and written, beyond the face of the loan documents, that bound MNB to continue to fund Howard Oaks" were unenforceable promises even if not barred by statute) (citing *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F. Supp. 1181, 1186 (D. Md. 1990), *aff'd. table*, 937 F.2d 603 (4th Cir. 1991)).

Defendants' asserted affirmative defense of accord and satisfaction fails because Defendant did not demonstrate that Capital Finance agreed to accept only partial Medicare and IGT payments. *Johnson v. Xerox Educ. Sols. LLC*, No. 0579, 2016 WL 4768866 (Sept. 13, 2016) (requiring an agreement between the parties for a party to accept a sum less than the amount he claims is due). Although Capital Finance received partial payments of the outstanding Medicare and IGT payments, nothing presented at trial indicated that Capital Finance accepted these payments in lieu of the full amount owed to it.

Finally, Defendants' unclean hands defense fails because they failed to present any evidence of this claim at trial. Capital Finance's mere awareness of Defendants' difficult financial situation does not indicate that it behaved inequitably by bringing this action.

### D. Capital Finance is entitled to damages.

Accordingly, as a result of each, and any one, of Borrower's illegal and fraudulent acts described herein, Defendants are obligated, pursuant to Sections 1(a) and 1(d) of the guaranties, to pay Plaintiff the Guaranty Obligations, which, exclusive of attorneys' fees incurred in this litigation, was proven at trial by Plaintiff to be $1,304,731.37 as of January 8, 2019. (Pl.'s Exs. 3 & 4, at §1(a), Pl.'s Ex. 23.) Interest, at the default rate, continues to accrue on the unpaid balance at a per diem rate of $200.22 (Pl.'s Ex. 23.) Pursuant to Md. Code, Cts.

& Jud. Proc., § 11-107, Plaintiff is further awarded post-judgment interest at the rate of ten percent (10%) per annum.

## II. Neuman is liable under Count V (Fraud).

### A. Neuman is liable because he falsely claimed that Borrowers had paid payroll taxes to obtain loans from Capital Finance.

To prevail on a claim of fraud under Maryland law, the plaintiff must show:

(1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Alia Salem Al-Sabah v. Jean Agbodjoghe, et al.*, ELH-17-730, 2019 WL 198982, at

*7-8 (D. Md. Jan. 14, 2019) (quoting *Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d

660, 668 (1994). These five elements must be proven by clear and convincing evidence.

*Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512 (2002).

The evidence presented at trial clearly shows that Neuman made false representations, with at least reckless indifference as to their truth, to defraud Capital Finance. On Borrowing Base Certificates dated December 6, 7, and 8, 2016, Neuman represented that Borrower was in compliance with the Credit Agreement and that it had paid all payroll withholding taxes. (Pl.'s Ex. 15.) At that time, however, Borrower had not paid payroll taxes. Rosenberg admitted that payroll taxes were not paid as of December 2016; Neuman similarly admitted that payroll taxes were not paid on time. (ECF No. 102, at 77:13-15; ECF No. 100, at 19:23-20:9.) Moreover, on December 11, 2016 Neuman informed Capital Finance that Borrower had a payroll tax liability of $400,000.00. (Pl.'s Ex. 13; ECF No. 99 79:6-80:10.) This

representation, made just days after executing the Borrowing Base certificates, is among the vast evidence from which this Court finds that Neuman knew that the statements on the Borrowing Base Certificates were false when he signed and submitted them.

Although Mr. Neuman testified that he did not read the language printed on the one-page Borrowing Base Certificates (ECF No. 100, at 53:6-9.), this Court finds this claim—and much of his testimony—unworthy of credence. First, Mr. Neuman showed a serious lack of credibility by providing evasive answers and contradicting his deposition testimony. In response to the question, "[Y]ou don't deny that the statements contained in these borrowing base certificates, Plaintiff's Exhibit 15, are false; right?" Mr. Neuman claimed the inability to understand the question. (ECF No. 100, at 50:1-51:16.) He quibbled with the definition of "accounts receivable," an uncontroversial accounting term. (ECF No. 100, at 45:4-17.) He testified at trial that he did not personally authorize every disbursement out of the Borrower accounts, but at his deposition he agreed that he was "authorizing every disbursement" and signed off on disbursals as small as $75.00. (ECF No. 100, at 46:10-47:4.)

Second, Mr. Neuman is a sophisticated businessman with years of experience in the healthcare industry. The sum of his testimony indicates that he knew that he had to make representations about the Borrower's financial health before obtaining additional loans from Capital Finance. This Court finds that, to the extent Mr. Neuman did not read the Borrowing Base Certificates, he failed to do so with a reckless disregard for the content of his statements.

Finally, Mr. Neuman signed the same one-page form throughout the life of the loan. His claim that he never paused to examine its averments at the very least demonstrates a

grossly irresponsible, reckless indifference to the truth. Under Maryland law, signatories to a contract are expected to read their terms. *See Danner, v. Int'l Freight Sys. of Washington, LLC,* ELH-09-3139, 2013 WL 78101, at *19 (D. Md. Jan. 4, 2013) (finding that one cannot accept a contract and then renege based on one's own failure to read it).

Capital Finance relied on the misrepresentations in the Borrowing Base Certificates and suffered compensable injury stemming from these misrepresentations. Although Capital Finance was aware that Borrower faced financial difficulties, it was not aware that Borrower had failed to pay payroll taxes. Mr. Stein testified that the failure to pay payroll taxes would raise "red flags" and that Capital Finance would not have provided additional loans had it known that Borrower had failed to meet its tax obligations. (ECF No. 99, at 53:1–5.) Instead, Capital Finance relied on Borrower's representations and decided to advance at least $1,000,000.00 to Borrower. (ECF No. 99, at 78:20–79:5.)

Finally, the exculpatory provision in the form borrowing certificates attached to the Credit Agreement do not prohibit Plaintiffs from pursuing fraud against Neuman. While the form Borrowing Base Certificates state that the signatory "shall not have any persona liability for the statements made in this Certificate, all such recourse being limited to Borrower," the parties did not use this form. (Pl.'s Ex. 1, at CAPFI-109.) Instead, the parties used Borrowing Base Certificates that did not include this language. Moreover, Maryland law prohibits parties from contracting out of fraud. *See Wolf v. Ford*, 335 Md. 525, 537 (1994) (observing that an exculpatory clause in an investment contract was invalid insofar as it attempted to disclaim liability for fraud).

**B. Capital Finance is entitled to actual damages, plus pre- and post-judgment interest, and punitive damages.**

This Court may only award damages which flow from the "natural, proximate and direct effect" of Neuman's fraudulent misrepresentations. *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631 (4th Cir. 1977). In determining the "proper measure of damages in fraud and deceit cases," Maryland applies the "flexibility theory," under which a victim of fraudulent misrepresentation may elect to recover either out-of-pocket expenses or benefit-of-the-bargain damages. *SG Homes Assocs., LP v. Marinucci*, 718 F.3d 327, 336 (4th Cir. 2013) (quoting *Hinkle v. Rockville Motor Co.*, 262 Md. 502, 278 A.2d 42, 47 (1971)). The former permits a plaintiff to recover his or her actual losses; the latter puts the plaintiff in the same financial position as if the fraudulent representation had in fact been true. *SG Homes*, 718 F.3d at 336 (citing Goldstein v. Miles, 159 Md.App. 403, 859 A.2d 313, 324 (2004); see also *Buie v. Sys. Automation Corp.*, 918 F.2d 955, 1990 WL 180126, at *11 (4th Cir.1990) (Table) (benefit-of-the-bargain damages may be employed only in "appropriate cases").

Due to its reliance on Neuman's fraudulent misrepresentations in the Borrowing Base Certificates, Plaintiff loaned at least $1,000,000.00 to Borrower. (ECF No. 99, at 78:20–23; 78:24–79:5.) Plaintiff seeks to recover this entire amount as damages—an amount representing its claimed actual losses. As previously discussed, however, only $575,705.65 in principle remains outstanding. Accordingly, this Court will award actual damages in the amount of $575,705.65. Post-judgment interest shall be awarded at the rate of ten percent (10%) per annum in accordance with Md. Code, Cts. & Jud. Proc., § 11-107.

Plaintiff additionally seeks prejudgment interest in the amount of six percent (6%) per annum. Following a bench trial, the district court has discretion to award prejudgment interest at a rate of six percent (6%). *Crystal v. West & Callahan, Inc.*, 328 Md. 318, 342, 614 A.2d 560, 572 (1992). Prejudgment interest is appropriate when the amount due has become certain, definite, and liquidated prior to judgment. *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 311 Md. 36, 53-54, 532 A.2d 694, 702 (1987) (citation omitted). In this case, prejudgment interest is appropriate because Capital Finance loaned a sum certain proved at trial to be no greater than $1,000,000.00 in reliance on Neuman's fraudulent misrepresentations. Accordingly, this Court shall award prejudgment interest of six percent (6%) per annum.

Plaintiff additionally seeks $1,000,000.00 in punitive damages against Neuman. Under Maryland law, an award of punitive damages is appropriate if the defendant acted with "actual malice," which is "conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud." Bowden v. Caldor, Inc., 350 Md. 4, 23, 710 A.2d 267, 276 (1998) (internal quotation marks omitted). In the case of a claim for intentional misrepresentation, "the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 234, 652 A.2d 1117, 1126 (1995). This state of mind must be proven by clear and convincing evidence. *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000 (1997).

The evidence demonstrates that Neuman represented that Borrower had paid payroll taxes, knowing that it had not, with the intent of obtaining additional loan advances from Capital Finance. His testimony that he did not read the Borrowing Base Certificates, which

contained these representations, is not credible. Neuman knew that the statements on these documents were false but certified to them anyway, certain that the Borrower's failure to pay payroll withholding taxes would raise "red flags" and cause Capital Finance to stop advancing funds. Accordingly, this Court will assess a punitive damages award.

Punitive damages should aim to "deter the wrongdoer and others from engaging in the same misconduct." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 88 Md. App. 672, 596 A.2d 687 (Ct. Spec. App. 1991), *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991) (subsequent history omitted). The amount should also be calibrated "to the gravity of the defendant's conduct" and should "not be disproportionate to . . . the defendant's ability to pay." *Bowden v. Caldor, Inc.*, 350 Md. 4, 27-28, 710 A.2d 267, 278 (1998) (quoting *Ellerin*, 337 Md. at 242, 652 A.2d at 1130). This Court finds that punitive damages in the amount of $200,000.00 will achieve these objectives.

## V. Neuman is liable under Count VI (Conversion).

### A. Josef Neuman committed the tort of conversion by diverting IGT payments and Medicare funds from DACA-controlled accounts to accounts at JP Morgan Chase.

The intentional tort of conversion consists of two elements: "a physical act combined with a certain state of mind." *Neal v. Pentagon Federal Credit Union*, ELH-18-451, 2018 WL 5786119, at *19 (D. Md. Nov. 5, 2018) (quoting *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261, 841 A.2d 828, 835 (2004). The physical act requires "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Neal*, 2018 WL 5786119, at *19 (quoting *Darcars*, 379 Md. at 261, 841 A.2d at 835). For the intent element, "an intent to exercise a dominion or control

over the goods which is in fact inconsistent with the plaintiff's rights" will suffice. *Neal*, 2018 WL 5786119, at *19 (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200, 208 (1985)). This element is satisfied even if the Defendant "acted in good faith and lacked any consciousness of wrongdoing." *Neal*, 2018 WL 5786119, at *19 (quoting *Darcars*, 379 Md. at 262, 841 A.2d at 836).

Although money is generally not subject to conversion claims, an exception exists for discrete, identifiable sums that have been diverted from their proper destination. *See, e.g.*, *Roman v. Sage Title Group*, 146 A.3d 479 (Md. App. 2016) (determining that "funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction" are subject to conversion claims (quoting *Allied Investment Corp. v. Jasen*, 354 Md. 547, 564-65, 731 A.2d 957 (1999))).

Plaintiff has demonstrated that Neuman committed the tort of conversion by diverting IGT and Medicare payments from the DACA controlled Banco Popular accounts to Chase and Santander bank accounts. As more fully described in this Court's findings of facts, he intentionally diverted Medicare payments throughout 2016 and then again between December 2016 and January 2017. (ECF No. 99, at 9:21–10:17, 15:17-19; Pl.'s Ex. 18, at CAPFI-440.) Through a series of wire transfers, he diverted IGT payments from their proper destination. (ECF No. 101 58:19-24; Pl.'s Ex. 18, at CAPFI-445.) These diversions deprived Capital Finance of discrete sums to which it had a legal interest and put Capital Finance "in a worse position" when it attempted to enforce its contract. (ECF No. 100 46:5–9.)

**B. Capital Finance is entitled to actual damages, plus pre- and post-judgment interest.**

Capital Finance sustained actual damages of $170,205.52 (the missing IGT payments) and $244,221.70 (the unpaid Medicare funds), for a total of $414,427.22. Under Maryland law, the measure of damages for conversion is limited to "the market value of the chattel at the time and place of conversion plus interest to the date of judgment." *Staub v. Staub*, 37 Md. App. 141, 145, 376 A.2d 1129, 1133 (1977). Accordingly, Neuman is liable to Capital Finance in the amount of $414,427.22. Additionally, this Court will exercise its discretion to award Capital Finance pre-judgment interest at the rate of six percent (6%) per annum. Post-judgment interest at the rate of ten percent (10%) per annum will also be assessed. Md. Code, Cts. & Jud. Proc., § 11-107.

## CONCLUSION

Having conducted a two-day bench trial on January 9, 2019 and January 10, 2019, heard eyewitness and expert witness testimony, considered documentary evidence submitted by the parties, heard the parties' legal arguments, and reviewed the parties' Proposed Findings of Fact and Conclusions of Law, this Court concludes as follows.

1. By submitting false Borrowing Base Certificates to obtain loan advances, Neuman committed fraud and caused Capital Finance to incur **575,705.65** in actual damages.[7] Plaintiff is further awarded pre-judgment interest at the rate of six percent (6%) per annum and post-judgment interest at the rate of ten percent (10%) per annum. Punitive damages are warranted in the amount of **$200,000.00.**

2. Neuman diverted IGT payments and Medicare payments from the DACA-controlled accounts at Banco Popular, causing Borrower actual damages of **$414,427.22.**[8] Plaintiff

---

[7] This amount is included in, and therefore duplicative of, the total amount owed under the guaranty agreements.
[8] This amount is included in, and therefore duplicative of, the total amount owed under the guaranty agreements.

is awarded pre-judgment interest at the rate of six percent (6%) per annum and post-judgment interest at the rate of ten percent (10%) per annum.

3. Rosenberg and Neuman are obligated to pay Capital Finance the outstanding obligations under the Guaranty agreements. As of January 8, 2019 that amount is **$1,304,731.37**, representing the sum of $575,705.65 in unpaid principle; $255,144.55 in default interest; $235,440.82 in legal fees (excluding fees associated with this litigation); $173,359.88 for field exam work; and $65,080.47 for lenders' monthly fees. Interest, at the default rate, continues to accrue on the unpaid balance at a per diem rate of $200.22. Plaintiff is further awarded post-judgment interest at the rate of ten percent (10%) per annum.

4. Judgment shall be ENTERED in favor of Capital Finance on Counts III and IV (Breach of Contract); Count V (Fraud); and Count VI (Conversion).

5. Rosenberg and Neuman SHALL PAY to Capital Finance a total of **$1,304,731.37**.

6. Neuman SHALL PAY to Capital Finance **$200,000.00** in punitive damages, over and above the total amount of $1,304,731.37.[9]

A separate order follows.

January 23, 2019                    _____/s/_____

                                    Richard D. Bennett
                                    United States District Judge

---

[9] Capital Finance seeks an award of attorney's fees. The proper procedure for requesting attorney's fees is to file a Motion within fourteen (14) days of the entry of judgment, as described in Local Rule 109.2(a)-(b) (D. Md. 2018).